UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
B.Z., individually and on behalf of J.Z.,

                    Plaintiff,

              -against-

Hewlett-Woodmere Union Free School District,

                    Defendant.
------------------------------------------------------------------X

**COMPLAINT**
**ECF Case No. 2:23-cv-1759**

      Plaintiff B.Z., individually and on behalf of his son, J.Z., by his attorney, Thivierge & Rothberg, P.C., as and for his Complaint, hereby alleges and states the following:

## PRELIMINARY STATEMENT

1.    Plaintiff B.Z., individually and on behalf of his child, J.Z., brings this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, § 300.342, *et seq.*, Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act of 1973, and Part 200, *et seq.*, of the Commissioner of Education's Regulations, against the Board of Education of the Hewlett-Woodmere Union Free School District ("The District").

2.    B.Z. seeks review and reversal of State Review Officer ("SRO") Sarah L. Harrington Decision dated November 16, 2022[1] ("SRO Decision"), which reversed Impartial Hearing Officer ("IHO") Barbara J. Ebenstein's Findings of Fact and Decision dated August 24, 2022[2] ("IHO Decision"). The SRO Decision erroneously found that the District offered

---

[1] A true copy of the SRO Decision, *Application of the Board of Education of the Hewlett-Woodmere Union Free School District*, Appeal No. 22-129, is annexed hereto as Exhibit A.
[2] A true copy of the IHO Decision for this matter is annexed hereto as Exhibit B.

J.Z. a free and appropriate public education ("FAPE") for the twelve-month 2021-2022 school year (July 2021 – June 2022), contrary to the findings in the well-reasoned IHO Decision, and denied B.Z.'s request for tuition and transportation reimbursement for J.Z.'s placement at Fusion Academy Long Island ("Fusion").

3. J.Z. presents with several serious medical diagnoses, severe psychiatric symptoms (including hallucinations and self-injury), and highly complex needs. He requires a highly tailored, flexible, and individualized program. For the twelve-month 2021-2022 school year, the District assigned J.Z. to attend a general education credit recovery program which did not and could not address his individual special education needs. The IHO properly found that the District's minimal program recommendation deprived J.Z. of a FAPE. Without justification, the SRO reversed in a Decision rife with error.

4. While the IHO properly found that the District had failed to address J.Z.'s severe mental health needs properly and sufficiently, the SRO erred in reversing this finding.

5. The SRO correctly found that B.Z. properly raised issues related to inappropriate consultant teacher services in the initial due process complaint, but erred in reversing the IHO's holding that the District's recommendation deprived J.Z. of a FAPE.

6. The SRO incorrectly held the District's lack of extracurricular programming were outside the scope of the hearing even though the District opened the door to this issue. *See M.H. v. New York City Dep't of Educ.,* 685 F.3d 217, 250-51 (2d Cir. 2012).

7. The SRO erred by concluding that B.Z. waived review of claims related to the District's failure to undertake a Functional Behavioral Assessment ("FBA") and develop a Behavior Intervention Plan ("BIP") for J.Z.

8.  The SRO erred in finding that the District's consultant teacher program (a part-time credit recovery course held in the evenings) could offer J.Z. a FAPE.

9.  The SRO additionally erred by failing to determine that the District predetermined J.Z.'s placement including by refusing to recommend extended school year ("ESY") programming for him.

10. The SRO further erred by excusing the District's failure to develop a transition plan for J.Z.

11. The SRO erred in finding the IHO applied an incorrect legal standard. The IHO's decision was thorough and well reasoned, and correctly applied legal standards for a *Burlington/Carter* tuition reimbursement case.

12. The SRO failed to defer to the IHO's witness credibility determinations.

## JURISDICTION AND VENUE

13. This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367, has jurisdiction over this action without regards to the amount in controversy.

14. Venue is proper pursuant to 28 U.S.C. § 1394(b) in that Plaintiff B.Z. and J.Z. and the Defendant District all reside in or are situated within this judicial district.

## THE PARTIES

15. B.Z. and his son J.Z. are not expressly named herein by their given names, or further identified by their actual addresses within the Eastern District of New York, because of privacy guarantees provided in the IDEA, as well as in accordance with the Family Educational Rights Privacy Act ("FERPA"), 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

16.   At all relevant times pertaining to this action, B.Z. and J.Z. were and are residents of the State of New York in Nassau County, residing at an address within the boundaries of the District.

17.   Defendant, the District, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligation to provide J.Z. with a FAPE in accordance with IDEA mandates.

### RELIEF BEING SOUGHT

18.   Plaintiffs seek a determination that (a) the District failed to provide J.Z. with a FAPE for the 2021-2022 school year; (b) J.Z.'s placement at Fusion was appropriate for him; (c) equitable considerations support B.Z. and J.Z.; (d) the District should reimburse B.Z. for J.Z.'s tuition at Fusion and associated transportation expenses; and (e) B.Z. and J.Z. are entitled to any other, further, and different relief the Court deems appropriate under the circumstances.

19.   Pursuant to the IDEA and New York State Education Law, all school districts within New York State are required to offer eligible students with disabilities educational programs tailored to meet these students' individual needs, and to provide each such student with a FAPE through an Individualized Education Program ("IEP"). Parents have separate statutory entitlements that are tied directly to their child's right to receive a FAPE. The FAPE requirements under the IDEA and the New York State Education Law are different for each child, and a "one size fits all" approach is not accepted. *F.L. v. Bd. of Educ. of Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 110 (E.D.N.Y. 2017), *aff'd sub nom. F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 F. App'x 38 (2d Cir. 2018), (*citing Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004)).

20. A District may be ordered to reimburse a Parent for private educational expenses obtained for a child if the District's services were inadequate or inappropriate ("Prong I"), the services selected by the Parent were appropriate ("Prong II"), and equitable considerations support the Parent's claims ("Prong III"). *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

21. The Supreme Court has found that Congress intended for such reimbursement to be available as a remedy for parents when the school district failed to offer the student a FAPE. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance," had the District offered the student a FAPE. *Burlington*, 471 U.S. at 370-71.

22. In New York State, there is a two-tier administrative due process review. A parent who believes that an IEP is insufficient may challenge it at a hearing before an IHO. 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003). The IHO's decision may be appealed to an SRO, and the SRO's findings may in turn be challenged in either state or federal court. *Id.* at 380. (citing 20 U.S.C. § 1415(g), (i); N.Y. Educ. L. § 4404(2)); *see also* N.Y. Educ. L. § 4404(1)(c).

23. The District Court "conducts a 'modified de novo' review of the administrative proceedings," and is charged with making an independent decision based on the preponderance of the evidence developed at the administrative proceedings, and any other evidence presented by the parties. *See M.N. v. N.Y. City Dep't. of Educ.*, 700 F.Supp.2d 356, 363-364 (S.J.Z.Y. 2010); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119,

122-123 (2d Cir. 1998). The Court does not "rubber stamp" administrative decisions, but rather, is expected to give "due weight" to the factual determinations made during the state administrative process. *Walczak,* 142 F.3d at 129; *see Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982). The Court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education where a school district fails to provide a FAPE." *Forest Grove School Dist. v. T.A.,* 557 U.S. 230, 239 (2009).

24.  In an action involving rights provided by IDEA, the District Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see M.S. v. N.Y. City Dep't of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).

## FACTUAL BACKGROUND

25.  J.Z. is an eighteen-year-old student with a disability, whose IEP classifies him as having an Emotional Disturbance. Ex. D-1. He has a rare type of schizophrenia called schizoaffective disorder (bipolar type), and he experiences significant depressive symptoms with mood fluctuations . Exs. 1, C, D, p. 17; T. 325, 682-84.[3] J.Z. also presents with Major Depressive Disorder (recurrent and severe, with psychotic features), Social Anxiety Disorder, and Generalized Anxiety Disorder. T. 734-36; Exs. D, p. 2; R, p. 6.

26.  J.Z. displays numerous impairing symptoms of schizoaffective disorder, including visual and auditory hallucinations, paranoid thinking, social withdrawal, persistent and severe anxiety, depression, intrusive thoughts, self-consciousness/self-loathing, and suicidal

---

[3] B.Z. and J.Z.'s exhibits are identified by [Exhibit Letter, p. page number] and the District's exhibits are referenced by [Exhibit Number, p. page number]. References to the transcript of the proceedings are identified as "T. [page]." References to the IHO Decision are referred to as "IHO Dec., p. [page]." References to the SRO Decision are referred to as "SRO Dec., p. [page]."

ideation. Exs. D, pp. 2, 16; R, p. 5; T. 395-96, 399, 450, 672, 674, 686-87. J.Z. described these symptoms and passive suicidal thoughts to Dr. Stephen Perret, his psychiatrist, and has also displayed signs of hypomanic states. T. 672, 688.

27.   J.Z. has engaged in self-injurious behaviors in the form of cutting and some of J.Z.'s auditory hallucinations have instructed him to engage in self-harm and kept him from sleeping. Exs. D. p. 2; R, p. 5.

28.   J.Z.'s emotional struggles were magnified following the death of his mother by suicide in 2016. T. 373, 404, 673; Ex. D, p. 2. J.Z.'s mother struggled with severe psychiatric disorders which were highly treatment-resistant, eventually leading to her death. T. 430-31; Ex. 8, pp. 1-2. J.Z.'s disorders have also proven to be treatment-resistant. T. 697-98.

29.   J.Z. began attending Hewlett High School in ninth grade and he had an "extremely difficult" transition into the school. T. 246, 406-07; Exs. D, p. 2; N, p. 5. He became so anxious over the prospect of going to Hewlett High School that he would vomit, and refused to shower or leave his bed for days on end. T. 407-08, 430.

30.   J.Z. was hospitalized multiple times while enrolled at Hewlett High School, until ultimately the District recommended placement for him first at a day treatment program, Summit Queens, and then at a residential placement, Summit Nyack. Ex. D, pp. 2-3; T. 408, 411-12.

31.   In the years that followed, the District made numerous medical and placement recommendations, none of which proved appropriate or effective for J.Z. T. 415-16, 673, 689, 702; Ex. D, p. 4. When he had some success with a particular psychiatrist, the District compelled him to stop seeing that provider in favor of the providers at the District's recommended program at Summit Nyack. T. 428-30, 435.

32. In his District-recommended residential placement at Summit, J.Z. did "little to no schoolwork," was severely depressed, and engaged in self-harm. Ex. R, p. 5; T. 88, 428, 433, 689, 703-05. J.Z. struggled with "emotional distress" at his District-recommended placements. T. 689.

33. After a holiday visit to his home, J.Z. informed B.Z. that he would rather die than return to Summit Nyack, no small threat given his mother's passing. T. 441-42. B.Z. informed the District about this situation and requested support. T. 84, 439-441. Instead, District staff essentially told him to force the already-traumatized J.Z. into a car and shove him out at Summit. T. 84, 439-441.

34. J.Z. earned no high school credits while attending any District recommended program.

35. In January 2021, B.Z. placed J.Z. at Fusion Academy Long Island ("Fusion"). Ex. D, p. 3; T. 444-447. Fusion offers a 1:1 instructional model that allowed the pace and timing of instruction to be tailored to J.Z.'s individual needs and alleviate his severe social anxiety. Ex. F. The program's flexibility also allowed J.Z. to receive therapeutic services from appropriate local providers while living at home. T. 704.

36. In May 2021, J.Z. underwent evaluation with Dr. David J. Marks, Ph.D., to assess his intellectual, educational, behavioral, emotional, and social functioning, and to make recommendations for J.Z.'s ongoing treatment and care. T. 309-10; Ex. D. Dr. Marks is a licensed clinical Psychologist and Associate Professor with NYU Langone Health/NYU Child Study Center. T. 304-05, 308.

37. Dr. Marks met with B.Z. and then J.Z. for three sessions of approximately three hours each. T. 311. J.Z. was open with Dr. Marks about how "tormented his journey really has been" and his doubts about treatment after the many, many failed treatments he had already

undergone. T. 313-14. However, he was notably more enthusiastic about his recent experiences at Fusion, where he had begun to "cultivate a real enthusiasm for school." T. 314.

38. Dr. Marks's testing demonstrated that J.Z. was struggling with Clinically Significant issues with Depression and Internalizing Problems. Ex. D, p. 13. J.Z. was also displaying behaviors in the At-Risk range in the areas Conduct Problems, Anxiety, Somatization, Withdrawal, and Overall Behavioral Symptoms. *Id*. J.Z.'s teacher at Fusion, Michelle Russo, reported that at Fusion J.Z.'s behaviors all appeared to be within the Average range except Anxiety, which fell in the At-Risk range. Ex. D, pp. 13-14. Dr. Marks reported that J.Z. found Fusion's nurturing, supportive, individualized instruction beneficial and allowed him to open to learning, noting Fusion "[had] become a haven for J.Z." Ex. D, pp. 16-17.

39. J.Z. completed a self-report questionnaire for Dr. Marks from the Adaptive Behavior Assessment System – Third Edition ("ABAS-3"), which evaluates a student's ability to perform various activities independently. Ex. D, pp. 14-15. J.Z.'s answers corresponded to the Extremely Low range for functional academics and leisure skills. *Id.* He endorsed having skills in the Low range for overall Conceptual, Social, and Practical skills (including in community behavior, home living, and self-care skills). *Id*.

40. Testing with the Clinical Evaluation of Language Fundamentals, Fifth Edition ("CELF-5") indicated that J.Z. had impaired higher-order language comprehension skills. Ex. D, p. 11. J.Z. also evinced weakness in cognitive testing in the area of Processing Speed, and discrepancies between various subtests evaluating his Working Memory. Ex. D, p. 16; T. 318. His abilities in both areas represented a regression from his 2019 testing with the District. T. 318-19.

41. Dr. Marks concluded that J.Z.'s "current academic setting [at Fusion had] been particularly instrumental" in helping J.Z. begin to "turn a corner" in making positive steps in his life. Ex. D, p. 17. At Fusion in a one-to-one program, J.Z. was able to regain confidence, engage in positive habits, pursue his interests in art and music, and become intrinsically motivated to attend and participate in schooling. Ex. D, pp. 17-18. In Dr. Marks' professional opinion, there was "an indisputable and inextricable relationship between J.Z.'s academic and emotional well-being." Ex. D, pp. 17-18. Overall, Dr. Marks emphasized that J.Z.'s emotional progress was due to the "more productive educational setting" at Fusion. Ex. D, p. 17-18. Dr. Marks recommended that J.Z. remain at Fusion as the program provided the support and flexibility which J.Z. needed. *Id.*

42. J.Z began receiving treatment from Dr. Stephen Perret in March 2021 as part of the ongoing effort to find appropriate treatment for his schizoaffective disorder. Ex. C; T. 355-56, 450, 657, 665, 668. Dr. Perret evaluated J.Z. and consulted with J.Z.'s therapist, Shragi Bernson. T. 424, 674. He began weaning J.Z. off his antidepressant medication, due to concerns that for negative impacts on individuals with mood disorders. T. 674-75.

43. The District convened a CSE meeting to develop J.Z.'s 2021-2022 IEP on June 17, 2021. Ex. 1. B.Z. participated in the meeting, along with Dr. Marks, Dr. Perret, and staff from Fusion familiar with J.Z. Ex. 1, p. 1; T. 195, 233, 335, 705. Fusion staff reported on J.Z.'s engagement and progress at Fusion, and answered all of the District's questions regarding J.Z.'s placement there. T. 198-200, 257, 465. They reported that J.Z. was able to engage with instruction and complete his schoolwork, and that he benefited from instruction and supports tailored to his needs, and having a teacher review and revise his work with him. Ex. 10; *see* T. 196.

44.    J.Z. earned his first high school credits in his academic career after attending Fusion, with an A in English and an A+ in Recording Arts/Music Production. Ex. 12; T. 241-42. He also was able to increase his class schedule from two to four, and then five, classes as he became more confident and able to engage in instruction. T. 452-53.

45.    Fusion staff provided a progress report to the CSE and described J.Z.'s success in the five classes he was taking at that time, English 9, Recording Arts/Music Production, Art, and Ancient Civilizations. Ex. 10. Dr. Marks shared the results of his evaluation of J.Z., described *supra*, and recommended that J.Z. continue to attend Fusion because J.Z. required 1:1 instruction and Dr. Marks was concerned about disrupting J.Z.'s first successful educational placement. T. 199, 335-36. Dr. Perret described J.Z.'s diagnoses and concurred with Dr. Marks's recommendation that J.Z. required placement at Fusion. Ex. C; T. 706. Drs. Marks and Perret also answered questions about their evaluations. T. 257.

46.    The District copied information from the Fusion progress report and Dr. Marks's evaluation into its IEP verbatim as it lacked any information of its own about J.Z. and did not meaningfully consider the recommendations of Fusion staff or Dr. Marks. T. 200-201. The District also accepted Dr. Marks's testing as "valid and reliable," but nevertheless refused to consider his recommendations for J.Z.'s programming. T. 53.

47.    The District refused to consider continuing J.Z.'s placement at Fusion. Instead, it indicated that it would recommend sending out application packets to New York State Approved Non-Public School ("NPS") programs. T. 336-37, 465, 706. No specific NPS program was selected or proposed. *Id*. The focus of the meeting was on discussing residential versus day treatment programs, not an in-District supplemental credit program as the District would

later recommend *infra*. T. 719. B.Z. informed the District that he would cooperate with any efforts to seek NPS programs for J.Z. and that he would consider any programs. T. 465.

48. By letter dated June 23, 2021, B.Z. wrote to the District that he was concerned by the District's recommendations and that during the CSE meeting, it was not clear to him which NPS programs were under consideration nor what class size the District intended to recommend. Ex. L. At that time, he had not received an IEP nor an NPS recommendation for J.Z. for the 2021-2022 school year. *Id*. B.Z. provided proper notice that subject to a timely and appropriate recommendation from the District, he would continue to send J.Z. to Fusion for the 2021-2022 school year, and would look to the District for reimbursement for the tuition, costs, and expenses for J.Z.'s program. *Id*. He also requested transportation from the District for J.Z., or reimbursement for transportation costs, related to J.Z.'s placement at Fusion. *Id*.

49. Subsequently, on July 29, 2021, B.Z. received a *Prior Written Notice* ("PWN") dated June 22, 2021 which stated that J.Z. was "recommended for a therapeutic day school program" at an unspecified NPS. Ex. 3; T. 481. The District failed to secure an actual placement for J.Z. in an NPS by the start of the 2021-2022 school year.

50. On October 14, 2021, well after the start of the school year, the District convened a second CSE meeting to make a placement recommendation for J.Z. for 2021-2022. Ex. 2, T. 483. B.Z. participated in the meeting, along with Dr. Marks, J.Z.'s therapist Mr. Bernson, and Fusion staff familiar with J.Z. Ex. 2, p. 1; T. 337-38. B.Z. described his concerns with the NPS programs that the District had suggested for J.Z. after meeting with those programs. T. 224-25, 338, 482. The entire CSE agreed that one NPS placement which had accepted

J.Z. was inappropriate, and other NPS placements had rejected J.Z. T. 224-25, 338, 482; Ex. 7, p. 1.

51. Fusion staff provided additional information about J.Z.'s continued progress at Fusion. T. 342, 367, 483-84, 490. J.Z. had finished the 2020-2021 school year with a 4.0 GPA and, as noted, his first high school credits. Ex. K. For the 2021-2022 school year, J.Z. was able to increase his course load as a result of his academic, social, and emotional progress. T. 453.

52. Dr. Marks and Mr. Bernson both recommended that J.Z. remain at Fusion. T. 338, 484. As reflected by the 10/14/21 proposed IEP, Mr. Bernson reported serious concerns that a "new school placement [would] be detrimental to J.Z.'s current social/emotional position" and that J.Z. had built positive momentum at Fusion that should be supported. Ex. 2.

53. Notwithstanding the recommendations from professionals familiar with J.Z., the District recommended that J.Z. attend its Twilight Program ("Twilight"), a general education program designed for credit recovery located at Hewlett High School, with Consultant Teacher Services. Ex. 2; T. 56, 339. J.Z. was unable to enter Hewlett High School due to past traumatic events there. T. 417.

54. Dr. Marks reiterated that J.Z. required a program with one-to-one instruction and individualized flexible scheduling, which is provided at Fusion and would not be available through Twilight. T. 327, 332-33, 732-34.

55. The District provided next to no information regarding Twilight at the initial meeting to discuss the program. T. 486-87. B.Z. later learned that Twilight provided instruction from 3:00 PM to 6:00 PM three days per week, with one class per day. T. 278, 295. Classes in the program ranged in size up to nine students, but as a general education program, the classes potentially could be far larger. T. 264, 275, 279. The recommended general

education program lacked the structure and therapeutic nature that the District agreed that J.Z. needed, and could not meet J.Z.'s serious special education needs.

56. By letter dated November 10, 2021, B.Z. provided notice to the District that the October 14, 2021, IEP recommendations were not appropriate for J.Z. Ex. M. Further, B.Z. provided supplemental notice that subject to an appropriate recommendation from the District for J.Z., he would continue to send J.Z. to Fusion for the 2021-2022 school year and look to the District for tuition and transportation costs. *Id.*

57. J.Z. continued to require intensive treatment and many medication trials to address his schizophrenia, which Dr. Perret testified was a common experience for individuals with schizophrenia. T. 696-97. As noted, J.Z. is also particularly susceptible to difficulties with medications. T. 697-98. In addition, Dr. Marks and Dr. Perret both testified that the nature of J.Z.'s schizoaffective disorder necessarily means that the severity of his symptoms will vary over time. T. 327, 332-33, 732-34.

58. The District had consistently failed to address J.Z.'s mental health disorders properly. As noted, the District forced J.Z. to change psychiatric providers by recommending that J.Z. attend the residential program at Summit Nyack, as that program required students to transition to internal providers. T. 379.

59. In the summer of 2021, Dr. Perret continued to adjust J.Z.'s medication to address issues with fatigue and liver function. T. 455-56, 676-78. In December 2021, J.Z. had another change as he was continuing to struggle with severe emotional and physical health concerns. T. 455-56, 681. Unfortunately, the December 2021 medication change proved detrimental to J.Z., necessitating hospitalization at South Oaks Hospital ("South Oaks") in late February 2022. T. 681, 690. J.Z. transitioned out of the hospital in March 2022 to an affiliated

temporary day treatment program, which he had a "very difficult" time attending. T. 691-93.

60.   Following his hospitalization, J.Z. was distressed and experiencing such significant adverse effects from the new medication prescribed by South Oaks that he visited an emergency room between being discharged and his next appointment with Dr. Perret. T. 693-94. J.Z. was forced to continue to try new medications as he battled fatigue from the prescriptions. T. 695-96.

61.   Even when his symptoms were at his worst during the 2021-2022 school year, J.Z. continued making an effort to attend Fusion: The staff at Fusion had demonstrated their investment in him, and for the first time in his high school academic career, J.Z. did not feel discouraged. T. 457, 463. Fusion's flexibility and tailored programming allowed J.Z. to continue to receive instruction amidst necessary medical treatments. J.Z. would not have had this option through Twilight.

62.   B.Z. filed a due process complaint on July 22, 2021, alleging that the District deprived J.Z. a FAPE for the 2021-2022 school year and seeking tuition reimbursement for Fusion and associated transportation costs. Ex. A. An amended due process complaint was filed on November 10, 2021. Ex B.

63.   Following an impartial hearing, the IHO correctly held that the District failed to offer J.Z. a FAPE. The IHO also found that J.Z.'s program at Fusion was appropriately tailored to his needs and that he had progressed, and that equities favored B.Z. and J.Z. Based on these findings, the IHO awarded tuition and transportation costs to B.Z. and J.Z.

## LEGAL CLAIMS

64.    The SRO Decision is not supported by testimony, evidence, or applicable law and review standards. The SRO failed to engage in a thorough and careful review of the testimony and evidence in the record, and the SRO Decision should not receive deference here.

65.    Moreover, the SRO Decision does not turn on educational expertise such that deference is warranted. *De novo* review compels a finding that the District denied J.Z. a FAPE.

66.    The District failed to develop a procedurally and substantively appropriate IEP for J.Z., which was calculated to enable him to receive educational benefits, for the 2021-2022 school year.

67.    The SRO relied on improper retrospective evidence in reaching her erroneous conclusion. There is nothing in the evidentiary record that supports a finding that the District's general education credit recovery program would be appropriate to meet J.Z.'s highly complex individual needs.

68.    The SRO improperly ruled that B.Z. waived claims by not cross-appealing from the IHO's Decision. SRO Dec., pp. 24-26. In fact, the "overwhelming authority in this Circuit… has found that a non-aggrieved party's failure to cross-appeal an unaddressed issue does not constitute a waiver*." G.S. v. Pleasantville Union Free Sch. Dist.*, 2020 WL 4586895, at *16 (S.D.N.Y. Aug. 10, 2020)(collecting cases). The Court in *G.S.* directly considered one of the cases cited by the SRO here, *M.C. v. Mamaroneck Union Free Sch. Dist.*, noting that it concerned a case wherein the IHO ruled against the parents, and they were therefore aggrieved. *G.S.*, 2020 WL 4586895, at *16 (*citing* 2018 WL 4997516, at *23 (S.D.N.Y. Sept. 28, 2018); SRO Dec. p. 24-26.

69. Where, as here, the "Parent received precisely the relief [he] sought: reimbursement for the Student's unilateral placement… [and t]herefore the Parent was not aggrieved, and [he] 'had neither the responsibility nor the right' to cross-appeal any portions of the IHO's decision*.*" *D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 588 (S.D.N.Y. 2012)(*quoting Antkowiak ex rel. Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988).

70. B.Z. properly raised the issue of the District's failure to conduct an FBA and develop a BIP in the original and amended due process complaint notices. Exs. A, p. 6; B, pp. 6, 8. The failure to undertake an FBA and develop a BIP, or provide other behavior supports, deprived J.Z. a FAPE. When last in a District program J.Z. struggled immensely, became emotionally dysregulated, and harmed himself (including cutting himself with a knife). Ex. R, p. 5; T. 411. J.Z. required individualized behavioral supports and interventions.

71. School districts must conduct an FBA, which provides detailed information about a student's problem behaviors, and develop a BIP, which provides strategies to reduce those behaviors, for a student whose behavior impedes his or her learning. *See* 20 U.S.C. § 1414(d)(3)(B)(i); 8 N.Y.C.R.R. § 200.22(a)-(b). While the failure to conduct an FBA and develop a BIP does not always result in FAPE deprivation, that only holds true where the IEP otherwise addresses a student's behaviors. *See R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 190-191 (2d Cir. 2012). The District's failure to support J.Z. behaviorally was a critical failure.

72. The SRO incorrectly glossed over the District's lack of extracurricular programming such as art and music at Twilight, erroneously holding that this was outside the scope of the hearing even though the District opened the door to this issue. SRO Dec., p. 23.

73.  Further, the IDEA does not require that parents allege IEP deficiencies detailed in any formulaic manner, and the Second Circuit has held that the waiver rule is not to be applied mechanically. *F.L.*, 274 F. Supp. 3d at 114(*citing C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014).

74.  The IHO failed to make a specific finding regarding the District's predetermination of J.Z.'s programming, and the SRO inaccurately found that the IHO had ruled on this point. *See* IHO Dec, pp. 19-20, SRO Dec, pp. 24-25. Both the IHO and SRO inaccurately held that the District's procedural violations did not deprive J.Z. of a FAPE, and both determinations should be reversed.

75.  This Court should not defer to the SRO's inaccurate holding that the District did not predetermine J.Z.'s placement, especially as "[t]he issue of predetermination is not a matter requiring educational expertise." *A.K v. Westhampton Beach Sch. Dist.*, No. 17-CV-0866 (GRB)(SIL), 2021 WL 621236, at *14 (E.D.N.Y. Jan. 6, 2021), *report and recommendation adopted sub nom. Killoran v. Westhampton Beach Sch. Dist.*, No. 2:17-CV-00866, 2021 WL 665277 (E.D.N.Y. Jan. 25, 2021).

76.  A school district engages in predetermination where it "not have an open mind" to consider alternative programs or services. *T.P. ex rel S.P. v. Mamaroneck Union Free Sch*. Dist., 554 F.3d 247, 253 (2d Cir. 2009).

77.  Predetermination reaches to a procedural violation of the IDEA when it deprives the parent of meaningful participation in IEP development. *J.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d, 606, 648 (S.D.N.Y. 2011); *see also Deal*, 392 F.3d at 858 (reasoning that an IEP can be predetermined even when the parents are afforded the opportunity to speak

at a CSE meeting, if the school district fails to involve the parents collaboratively and consistently rejects parental requests).

78.    In *E.H. v. N.Y. City Dep't of Educ.*, 164 F.Supp.3d 539, 552-553 (S.D.N.Y. 2016), the Court found that the CSE engaged in predetermination where it failed to consider more restrictive options at a parent's request. Just as in *E.H.*, here the SRO "effectively cast the Parent's argument as an objection that the CSE did not adopt [his] opinion, rather than one related to [his] meaningful participation…[b]ut this conclusion is irrelevant to the proper inquiry." *E.H.*, 164 F. Supp. 3d at 552.

79.    Predetermination is contrary to the provision of FAPE as it "…undermines the IDEA's fundamental goal to give parents a voice in the educational upbringing of their children." *D.D.-S. v. Southold Union Free Sch. Dist.*, 2011 WL 3919040, at *10 (E.D.N.Y. Sept. 2, 2011).

80.    Here, the District failed to make a singular recommendation for J.Z.'s placement for the 2021-2022 school year, and additionally failed to make a timely and appropriate recommendation for J.Z. prior to the start of the 2021-2022 school year.

81.    The District deprived B.Z. of clarity and meaningful participation in the development of J.Z.'s IEP. Instead, the District suggested two incompatible and inconsistent programs for J.Z. to attend until October 2021. Exs. 3, 18. The IHO correctly determined that the District's recommendations in its *Prior Written Notices* were not reflected in J.Z.'s IEP. *See* IHO Dec., p. 19. However, the IHO incorrectly excused the District's errors and found that the inconsistencies in J.Z.'s educational documents did not impede B.Z. from participating in full decision-making. B.Z. was forced to make choices for J.Z. after the CSE meetings and with the information he had been provided.

82. At the June 2021 IEP meeting, the District discussed recommending a New York State approved non-public school ("NPS") placement for J.Z. T. 465, 469-72. The District's *Prior Written Notice* indicates "[a]fter careful consideration and review of all evaluative materials, school reports, provider reports, parent input, student functioning, and Committee discussion, [J.Z.] was recommended for a therapeutic day school program." Ex. 3.

83. The District's selection of a therapeutic day school program for J.Z. was not the result of "careful consideration." Rather, the District assigned this type of program as it failed to secure an NPS placement for J.Z.by the start of the 2021-2022 school year. *V.A. v. City of New York,* No. 20-CV-0989 (EK)(RML), 2022 WL 1469394, at *11 (E.D.N.Y. May 10, 2022)(holding that the failure to "identify any school" for a student before the start of the school year was a denial of FAPE).

84. Then, to make matters worse, the District also failed to locate a therapeutic day school setting for J.Z. prior to the start of the 2021-2022 school year. Seemingly out of options, the District proposed that J.Z. attend Twilight. This fallback recommendation for a General Education credit recovery program lacked the intensity J.Z. needs as a student with a severe psychiatric disability and J.Z. would have regressed in the program. Twilight did not comply with any of the program requirements so recently recommended by the October 2021 *Prior Written Notice:* it was not therapeutic, not held during the day, nor a school: it was essentially a credit recovery or supplement program held at night for students who also attended the District day program. T. 339-40, 382, 486, 708.

85. Further, the District copied information from the Fusion progress report and Dr. Marks's evaluation into its IEP verbatim, but failed to meaningfully consider the recommendations

of the professionals most familiar with J.Z. and his educational needs. T. 200-201; Exs. 1; 8, 10.

86.   The SRO ignored the fact that the District failed to choose between the recommendations it allegedly considered, leaving B.Z. in a state of uncertainty. *See* SRO Dec., pp. 24-25.

87.   In assessing the District's failures as a whole, it is clear that the District failed to offer J.Z. a FAPE for the 2021-2022 school year. *See L.O. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 124 (2d Cir. 2016). Multiple violations "display[ ] a pattern of indifference to the procedural requirements of the IDEA" in which the District "repeatedly violat[ed] its obligation under the statute, which consequently resulted in the deprivation of important educational benefits to which [the student] was entitled by law." *Id*.

88.   The District was required to develop an IEP which included J.Z.'s present levels of academic achievement and functional performance and failed to do so. 8 NYCRR § 200.4(d)(2)(i). Even after two CSE meetings, the District omitted Dr. Marks' conclusions while reciting his summary of J.Z.'s status. The District copied and pasted two paragraphs word for word from Dr. Marks's evaluation into the Social Development section of the proposed IEP but cut off Dr. Marks's conclusions. Exs. 1, 2, D, p. 17.

89.   The IHO and SRO both failed to grapple with relevant case law on the issue of the District's failure to recommended Extended School Year ("ESY") services for J.Z. IHO Dec, p. 22, SRO Dec., p. 25.

90.   A student is eligible for ESY services if a 12-month educational program is needed "to prevent substantial regression." 8 N.Y.C.R.R. § 200.6(k)(1). Guidance from the New York State Education Department's Office of Special Education states that "there is no requirement that a child actually demonstrate 8 weeks of regression in order [for a CSE to

recommend an ESY program…. [The goal of recommending ESY is] to prevent substantial regression."[4]

91.    When a student has been recommended to receive ESY services in the past and the District seeks to remove that recommendation, "the burden remains on the District to show that the student did not exhibit a need for ESY services in order to prevent substantial regression." *C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933 CS, 2013 WL 1285387, at *14 (S.D.N.Y. Mar. 28, 2013)(internal quotation marks omitted).

92.    Here, District Assistant Director for Special Education Kathleen Granelli testified without citation to any testing or evaluation that J.Z. was not eligible for ESY services. T. 218. The District failed to consider ESY for J.Z. at either the June or October 2021 CSE meetings. T. 253. Ms. Granelli merely testified that the "program recommended is a ten-month program," suggesting the decision not to offer ESY was based on the program the District had in mind rather than J.Z.'s unique needs. T. 253.

93.    In another example of predetermination, Ms. Granelli did not appear to be familiar with the standard for ESY, testifying that it is "only considered for students with significant cognitive impairment." T. 218. This claim that finds no support in law or regulation: ESY services are available for any student who needs them to prevent substantial regression. 8 N.Y.C.R.R. § 200.6(k)(1). Ms. Granelli chaired both CSE meetings for J.Z. for the 2021-2022 school year, and at both meetings the District refused to provide ESY services for J.Z. T. 193, 224.

---

[4]       "Extended         School         Year         Questions         and         Answers," https://www.p12.nysed.gov/specialed/applications/documents/application-procedures-and-q-and-a-on-extended-school-year-programs.pdf (last updated June 2022).

94. The SRO erred in dismissing issues related to Twilight's lack of extracurricular programming such as art and music. SRO Dec., p. 23. As noted, this was within the scope of the hearing, especially as the District opened the door to this issue. B.Z. was "respond[ing] to an allegation by the district" regarding extracurriculars. *Id.* When a parent responds to a District's argument "that the IEP's placement was better in part" due to something, the District opens the door to arguments from the parent regarding that issue. *M.H.,* 685 F.3d at 250-51.

95. Further, there was extensive testimony at the hearing regarding the importance of extracurricular programming for J.Z. T. 334, 341, 711, 733-34. Therefore, the District was aware and on notice of B.Z.'s concern about the lack of extracurriculars offered to J.Z.

96. Tailored non-academic classes at Fusion were the "lynchpin" of J.Z.'s success at Fusion, and Dr. Marks testified that losing access to these extracurricular classes would deprive J.Z. of a crucial component of his educational programming and cause him to regress into school refusal. T. 82, 334, 341, 711. At Fusion, J.Z. took art, music, and fashion design courses in addition to his academic classes. Exs. G, K; T. 334, 733. The District's School Psychologist testified that Twilight did not offer music or art. T. 82.

97. Dr. Perret also noted that J.Z.'s feelings about his passion projects such as music have a significant impact on his mood and ability to engage. *See* T. 733-34. The elective classes at Fusion got J.Z. in the door and into his classrooms each day. T. 334.

98. The IHO correctly held that the District's program was not reasonably calculated to provide educational benefit to J.Z. given his unique circumstances. IHO Dec, pp. 21-23. The SRO wrongly framed the IHO decision as comparing Fusion and the District program. SRO Dec., p. 26. In fact, the IHO merely used this comparison to describe the ways in which Twilight

was inappropriate for J.Z. *See* IHO Dec., pp. 21-23. The SRO, by contrast, repeatedly cited to J.Z.'s success at Fusion as evidence that J.Z. could succeed at Twilight despite the significant differences between the programs (described *infra*) and despite J.Z.'s particular trauma regarding the building where Twilight took place. *See* T. 470.

99.   Further, by claiming that its program was similar to Fusion and testifying that it was attempting to "replicate" Fusion's program (T. 212-13), the District effectively agreed that a program like Fusion was what J.Z. required. *See* T. 21, 61, 212-13, 216. As the SRO correctly noted, the District "invit[ed] the comparison." SRO Dec., p. 35. Given the District's implicit agreement on this point, it was warranted to determine whether the District had succeeded in its stated goal of replicating Fusion's program (which it failed to do).

100.  The SRO inaccurately credited incorrect testimony from the District that J.Z. "presented without any concerns with his learning." SRO Dec., p. 35 (*citing* T. 215, internal quotation marks omitted). In fact, Dr. Marks's testing demonstrated that J.Z. struggled with deficits in language and listening comprehension that impeded his learning. Ex. D, p. 16. Dr. Marks testified that a "conventional" or setting more densely populated than Fusion would cause J.Z. to regress due to these language deficits. T. 330. In a larger setting, J.Z. would struggle to understand the information presented to him, and it would be more difficult for instructors to gauge his understanding or track whether he was following with instruction. T. 330-31. Dr. Marks testified that in a larger classroom setting, like at Twilight, J.Z. would struggle to grasp narrative content and be highly vulnerable to missing details, and that it would not be possible to gauge his level of understanding accurately. T. 321-22, 346, 359.

101. It was inappropriate for the District to recommend a general education program for J.Z. Prior to the June 2021 CSE meeting, J.Z.'s two most recent IEPs (including one from February 2021) had recommended placement in a 12:1:1 special class within a residential program, including an IEP developed only four months prior to the June 2021 CSE. Exs. N, R. The District lacked evaluative justification for recommending Twilight or that J.Z.'s recommendation be changed from one of the most restrictive placements available to the least restrictive option.

102. First, the IHO correctly held that J.Z. could not participate in group instruction, even virtually, due to his intense social anxiety. IHO Dec., p. 21. Therefore, the District program's range of group class sizes were not appropriate for J.Z. *See* IHO Dec., p. 22.

103. School districts must "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F. v. Douglas County Sch. Dist.*, 137 S. Ct. 988, 1002 (2017). Here, District witnesses failed to explain how a group setting could meet J.Z.'s individual and unique needs when he had never been able to participate in a group before and all experts stated that he could not do so. The SRO inappropriately shifted the District's burden onto B.Z. by claiming that B.Z. should have pressed the District for more information about its proposed Twilight program when the District had a responsibility to provide that information. SRO Dec., p. 25 n. 27. In fact, B.Z. *did* request additional information about Twilight. *See* Ex. 2, pp. 6-7.

104. As Dr. Marks testified and explained at the CSE meetings, J.Z. could receive an educational benefit only from a program he was able to attend, and he was unable to attend a program without one-to-one instruction. T. 370-71. Even in smaller and more nurturing programs

than Twilight, J.Z. could not function. T. 371. During the 2021-2022 school year, J.Z. was not able to tolerate socialization with peers in a classroom. T. 729. As Dr. Perret testified, J.Z.'s success at Fusion was bolstered by the individualized instruction he received, but even more important than that was that he could work one-on-one. T. 742. The absence of peers in the same classroom freed J.Z. from his continual stress over being observed by other people. T. 742.

105. Dr. Marks testified that J.Z.'s psychosis related symptoms "tremendously imperil [J.Z.'s] ability to engage and sustain academically," and that his severe needs mandated placement in a one-to-one environment where he could have appropriate support and monitoring. Ex. D; T. 327. This level of one-to-one instruction and quiet would not be possible in the variously-sized classes at Twilight.

106. Further, J.Z.'s history with inappropriate placements and paranoia rendered him an "incredibly brittle" student who would regress severely if forced out of an appropriate placement into one where he felt unstable. T. 711-12. As noted, even the District seemed to endorse Fusion as an appropriate program for J.Z. "[W]hen the reports and evaluative materials present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits." *A.M. v. N. Y. City Dep't. of Educ¸* 845 F.3d 523, 542 (2d Cir. 2017)(*citing R.E.*, 694 F.3d at 190).

107. Prior to attending Fusion, J.Z. was placed in District classes of four to six students which were inappropriate for him. T. 346. J.Z.'s IEP lacked a class size recommendation, leaving B.Z. without information about where the District would seat J.Z. *See* Exs. 1, 2. Even at the hearing, District staff provided inconsistent testimony regarding the class size at Twilight.

Ms. Granelli testified that the classes went up to five students, while Laura Peterson, the District's Executive Director for Special Education Services, testified that classes went up to nine students. T. 185, 264, 275, 279.

108. The SRO incorrectly stated that Dr. Marks did not indicate that one-to-one instruction was necessary for J.Z. SRO Dec., p. 35. Dr. Perret and Dr. Marks *both* recommended in their reports (which predated the CSE meetings) that J.Z. remain at Fusion, where he had been attending school since January 2021. Exs. D, pp. 3, 18; C; T. 335-36, 338, 444-447, 464-65. As everyone at the CSE meetings was aware, Fusion is a one-to-one program. As Dr. Marks testified and explained at the CSE meetings, J.Z. could only receive educational benefit from a program he was able to attend, and he was unable to attend a program that lacked one-to-one instruction. T. 370-71.

109. The District's proposed management needs and supports could not rescue its inappropriate program. Dr. Marks testified that these supports (such as breaking assignments into smaller parts or step-by-step outlines) would not be sufficient to help J.Z. keep up with instruction at Twilight. Ex. 1; T. 361-62, 380. Although these tools helped J.Z. organize information in Fusion's one-to-one environment, where instruction was tailored to J.Z.'s pace, they could not help him process the large quantity of information provided in a group general education setting quickly enough to keep up with the pace of instruction. T. 361-62. The District's efforts to copy and paste accommodations provided to J.Z. at Fusion directly into its IEP cannot make up for its failure to recommend an appropriate one-to-one class placement. *See* Exs. 1, p. 8; 10, p. 2; T. 206-07.

110. Second, the IHO correctly found that the District had not made a definite recommendation for a direct consultant teacher for J.Z., despite his need for one-to-one instruction. *Id.* at 22-

23. The SRO cited testimony from the District acknowledging that the District's CSE Chairperson did not know whether the direct consultant teacher would be assigned to J.Z. alone or to a group of students in the classroom, but failed to analyze the District's failure to make a clear recommendation on this point. SRO Dec., p. 35; T. 265. The SRO fails to explain how consultant teaching services could meet J.Z.'s needs. In fact, J.Z. needed a more intensive program and consultant teaching cannot address J.Z.'s special education needs.

111. Third, the IHO correctly held that if the District had assigned a direct consultant teacher for J.Z., it would be inappropriate for him to receive one-to-one instruction in front of a class of other students due to his severe anxiety. IHO Dec., p. 23. Drs. Marks and Perret both testified that J.Z. would find being followed around by a consultant teacher stigmatizing and embarrassing, and that these issues would lead to school refusal and regression. T. 340-41, 381, 488, 708-10. While the District was required to "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances," *Endrew F.*, 137 S. Ct. at 1002, it was unable to answer as to how to avoid the deleterious effects of assigning a consultant teacher to work with J.Z.

112. Based on his work as a consultant for several school districts and his observations of students receiving consultant teacher services, Dr. Perret testified that this intervention was inappropriate for J.Z. T. 714-15. As a result of his trauma and paranoia, J.Z. is hypervigilant. T. 739. He would notice a consultant teacher following him, and it "would immediately trigger him and he would decompensate." T. 739. It would also be clear to his peers that he was being shadowed, which would further trigger J.Z.'s paranoia and lead to regression and

school refusal. T. 739. J.Z.'s social anxiety disorder and severe self-consciousness about peers' opinions negatively impacts his ability to attend school. T. 669, 701-02, 708.

113. All or most of the other students attending Twilight would also have been attending the District's daytime school program, once again leaving J.Z. unique and stigmatized from his classmates. T. 278, 293, 340-41, 381.

114. Twilight was a credit recovery program "for students who are already enrolled in high school," not a program intended to be a student's entire academic program as was recommended for J.Z. T. 278; *see also* T. 91, 470.

115. Fourth, the IHO correctly held that J.Z. required instruction which could "pause" as needed when he experienced a mental health emergency. IHO Dec. pp. 21-22. The District's program did not have the leeway to pause its instruction. IHO Dec., p. 23.

116. Fifth, the IHO correctly found that J.Z. was unable to enter the District's Hewlett High School building where Twilight was located. IHO Dec., p. 23. The SRO inaccurately focused on the fact that J.Z. had difficulty attending other programs, to find that he did not have a specific aversion to Hewlett High School, without appropriate citation to the facts or law. SRO Dec, p. 37. However, J.Z.'s issues with other programs did not preclude him from experiencing a trauma response to Hewlett High School nor prove the SRO's contention that J.Z. could have attended that program.

117. District witnesses acknowledged that J.Z. had an "extremely difficult" time at Hewlett High School and was not able to enter the building for academics or clubs, even with significant outreach from a District social worker and guidance counselor. T. 73, 97, 246, 417-18; Exs. D, p. 2; N, p. 5. As the IHO correctly determined, the District did not offer any evidence at hearing explaining how it would address this issue. IHO Dec., p. 23. The District also failed

to offer any such evidence in its Request for Review to the SRO. Further, the District failed to discuss, collaboratively, B.Z.'s concerns about a program located at Hewlett High School.

118.  In fact, the SRO failed to contend with significant testimony regarding J.Z.'s inability to enter Hewlett High School. Dr. Marks testified that J.Z. would not be able to attend a program in Hewlett High School specifically. T. 381. B.Z. testified that J.Z. would become nauseated at the thought of returning to Hewlett High School in ninth grade. T. 417. During his chronological ninth-grade year, there were so many attempts to get J.Z. to attend Hewlett High School while he was struggling with severe emotional distress that he formed a trauma response to the building. T. 465. The District summarily and inappropriately dismissed B.Z.'s concerns that J.Z. would not be able to attend a program in Hewlett High School. T. 469-70.

119.  Sixth, the IHO correctly found that Twilight was open for the limited hours of 3:00 PM to 6:00 PM three days per week, while Fusion had the flexibility to offer classes for Joseph at any time from 8:00 AM to 8:00 PM on any weekday. IHO Dec., p. 23; T. 278, 295. As Twilight offered just nine hours of instruction per week, J.Z. would not receive instruction sufficient to keep him on pace for graduation in this program. T. 266, 294-95, 340.

120.  The SRO incorrectly found that the District did not know at the time of the June 2021 CSE that J.Z. required a flexible schedule to address his mental health needs. SRO Dec., p. 38. In fact, Dr. Marks's report and recommendations included J.Z.'s need for scheduling flexibility, which encompassed the concept of a "pause" while J.Z. was hospitalized and a general flexibility with time and date of class offerings. Ex. 8, p. 18, T. 68, 329, 346. B.Z.

provided Dr. Marks's report to the District ahead of the June 2021 CSE meeting. Ex. 1, pp.1-2.

121. Also, the SRO inappropriately dismissed the District's failure to plan for J.Z.'s need for flexibility to address mental health struggles, claiming this was not possible given the "unpredictability" of his needs. SRO Dec., p. 38. The District had an example of precisely how to address J.Z.'s need in the form of Fusion, and had every opportunity to recommend one-to-one instruction for J.Z.

122. The SRO failed to properly analyze the District's failure to develop an appropriate transition plan for J.Z. SRO Dec., pp. 39-40. The IHO correctly found that the District failed to discuss any transition plan for J.Z. despite his being eighteen years old. IHO Dec., p. 23.

123. A school district's developing a vague and generic transition plan violates a student's substantive right to a FAPE when such plans are so generic that they would impede the parent's decision-making process or deprive the student of educational benefit. *See J.M. v. N.Y. City Dep't of Ed.*, 171 F.Supp.3d 236, 247-48 (S.D.N.Y. 2016).

124. Here, the District's IEPs referred only to vague goals that J.Z. would graduate from high school and attend college. Moreover, the IEPs overall lacked sufficient, appropriate post-secondary goals and support for J.Z.'s needs are not supported by the IEP as a whole. Exs. 1, p. 10; 2, p. 10.

125. The SRO erred by ignoring and/or glossing over the significant testimony and evidence demonstrating that the District's IEPs and program recommendations would not have been appropriate for J.Z., and should be reversed.

126. The SRO erroneously found that the District's IEP was appropriate for J.Z. even though it failed to recommend an appropriate class placement, and should be reversed.

127. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the professionals who evaluated J.Z. and worked with him had recommended that he be placed in a one-to-one program, and should be reversed.

128. The SRO erred by ignoring and/or glossing over the testimony and evidence that the District predetermined its placement for J.Z., and should be reversed.

129. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the District's recommended direct teacher consultant services were inappropriate for J.Z.'s needs and would cause him to regress, and should be reversed.

130. Overall, the SRO failed to issue a careful and thorough decision, and thus, it is respectfully submitted that this Court should not defer to the SRO's improper determinations.

131. The record as a whole demonstrates that B.Z. has met the Prong II burden for tuition reimbursement/funding as Fusion offered J.Z. instruction and supports tailored to his unique needs, and that J.Z. progressed meaningfully at Fusion, as the IHO properly found.

132. The record as whole demonstrated that B.Z. cooperated with the District such that equities weigh in B.Z. and J.Z.'s favor.

**RELIEF SOUGHT**

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(a)    reverse the November 16, 2022, SRO Decision it its entirety;

(b)    affirm the August 24, 2022, IHO Decision in its entirety;

(c)    declare that the District denied J.Z. a FAPE for the 2021-2022 school year; that J.Z.'s father has met the applicable Second Circuit standards for reimbursement of unilaterally provided tuition and special education services for J.Z. for the 2021-2022 school year; and that the equities favor J.Z. and his father;

(d)     order the District to reimburse B.Z. for J.Z.'s program at the Fusion for the 2021-2022 school year;

(e)     order the District to reimburse B.Z. for the costs and expenses of providing J.Z. with transportation to and from the Fusion for the 2021-2022 school year;

(f)     declare J.Z. and his father to be the "prevailing party" for purposes of the IDEA's fee-shifting provision;

(g)     grant leave to Plaintiff's counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative impartial hearing level, the SRO level, and in this action, pursuant to the IDEA's fee-shifting provisions; and

(h)     grant Plaintiff such other, further, and different relief as may be just under the circumstances.


Dated: Huntington, New York
        March 7, 2023

                                        /s/
                                        _____
                                        Christina D. Thivierge (CT 9565)
                                        Thivierge & Rothberg, P.C.
                                        Attorneys for the Plaintiff
                                        22 High Street
                                        Huntington, New York 11743
                                        Tel: (212) 397-6360
                                        Fax: (212) 397-6361
                                        christina@trspecialedlaw.com