**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
B.Z.,
*individually and on behalf of J.Z.*,

               Plaintiff,

         -against-

HEWLETT WOODMERE UNION
FREE SCHOOL DISTRICT,

             Defendant.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**
23-CV-01759 (OEM) (SIL)

**ORELIA E. MERCHANT, United States District Judge:**

      Plaintiff B.Z., both individually and as the parent of minor J.Z., brings this action against Defendant the Hewlett-Woodmere Union Free School District (the "District") under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.*, and its implementing regulations, § 300.342 *et seq.*, Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act of 1973, and Part 200, *et seq.*, of the Commissioner of Education's Regulations. Complaint, ECF 1. B.Z. seeks reversal of an administrative decision of a State Review Officer ("SRO") denying reimbursement of tuition and related expenses for J.Z.'s education for the 2021-2022 school year. *See id.*

      Before the Court are the parties' cross-motions for summary judgment.[1] For the reasons stated below, the Court grants B.Z.'s motion for summary judgment and denies the District's cross-motion for summary judgment.

---

[1] *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgement ("Pl's Mem."), ECF 18-2; Defendant's Memorandum of Law in Opposition to Motion for Summary Judgment and in Support of Defendant's Cross Motion for Summary Judgment ("Def's Mem."), ECF 19-2; Plaintiff's Reply Memorandum ("Pl's Reply"), ECF-18-4; Defendant's Reply Memorandum ("Def's Reply"), ECF 18-3.

# BACKGROUND

## A. The IDEA

The IDEA requires any school district that receives funding assistance under the Act to provide a "free appropriate public education" ("FAPE") to every child with a disability. 20 U.S.C. § 1412(a)(1)(A). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

An IEP is a "written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *V.A. v. City of New York*, No. 20-CV-0989 (EK) (RML), 2022 WL 1469394, at *1 (E.D.N.Y. May 10, 2022) (internal citations and quotations omitted). IEPs have been described as the "centerpiece of the IDEA's education delivery system." *Id.* Committees on Special Education ("CSE"s) are tasked with developing a student's IEP. In doing so, a CSE must consider four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *M.H. v. New York City Dep't of Educ.* ("*M.H. II*"), 685 F.3d 217, 224 (2d Cir. 2012) (internal citation and quotation marks omitted); *see* N.Y. Comp. Codes R. & Regs. ("NYCCRR") tit. 8, § 200.1(ww)(3)(i)).

If a parent believes an IEP is insufficient under the IDEA, he or she may unilaterally place the student in an educational program and challenge the IEP by filing a due process complaint, seeking review before an impartial hearing officer ("IHO"). *Id.* (citing 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)). At the hearing, the district bears the burden of demonstrating that its proposed IEP is appropriate, and the parent must demonstrate that its unilateral placement was

appropriate. *Id.* at 224-25 (citing N.Y. Educ. Law § 4404(1)(c)). "An IHO's decision may, in turn, be appealed to a [SRO], who is an officer of the State's Department of Education." *Id.* at 225. If successful, the parent may be entitled to tuition reimbursement for the student's unilaterally selected educational program. *Id.*

### B. Factual Background[2]

The student in this case, J.Z., has a significant history of complex psychiatric problems including bipolar-type schizoaffective disorder, major depressive disorder, social anxiety disorder, and generalized anxiety disorder. *See* Ex. 1 at DE9; Ex C at PE21; Ex D at PE23, PE38; Ex R at PE105; T. 325, 682-84; T. 734-36. J.Z. began attending school in the District in the ninth grade for the 2018-2019 school year. SRO Decision at 3. After experiencing significant psychological problems and at one point being hospitalized, J.Z. was classified as a student with "emotional disturbance." *Id.*; Ex. 1; Ex. 2. This made him eligible for special education services under the IDEA and State law.

During the summer of 2019, J.Z. was referred to a CSE, which recommended that he attend a therapeutic day program for the following year. SRO Decision at 3. J.Z. was again hospitalized that fall and began attending the day program in January 2020. *Id.* The CSE convened again in February 2020 and issued another IEP, noting that J.Z. had difficulty with attendance and agreed to "explore residential programs" with the support of the therapeutic day program and the parent. *Id.*

J.Z. began attending a residential program in July 2020. However, J.Z. did not return for the fall semester as B.Z. had "chosen to keep him home as a fully remote student" citing Covid-

---

[2] The Court's account of the underlying facts is drawn from the Administrative Record ("AR"), ECF 13, which includes, *inter alia*, the decision of the SRO, ("SRO Decision"), the Findings of Fact and Decisions of the IHO ("IHO Decision"), transcripts of the six hearings held before the IHO, ("T."), exhibits submitted by the Parent (lettered exhibits), and exhibits submitted by the District (numbered exhibits).

19 concerns. *Id.* J.Z.'s performance as a remote student declined and he did not receive any credit for his remote courses in the first quarter. *Id.* Another IEP was issued in December 2020, which noted that J.Z. "appeared to adjust positively" but "continued to experience significant psychiatric symptoms which impacted his academic performance." *Id.* at 4. The District indicated it would arrange for 6 weeks of home instruction to prepare J.Z. to return to the residential program. *Id.*

The CSE convened again in February 2021. At that time, B.Z. reported J.Z. had been attending Fusion Academy Long Island ("Fusion"), a private school, since January 2021 and was showing significant improvement, despite J.Z.'s continued psychiatric issues. *Id.* at 6-7. J.Z.'s psychiatrist, Dr. Stephen Perret ("Dr. Perret"), reported in April 2021 that since attending Fusion J.Z. had made "substantial educational gains," "earning credits in every class," and received "outstanding teacher reports." *Id.* at 7. In May 2021, an independent psychological evaluation performed by Dr. David J. Marks ("Dr. Marks") reported that J.Z. had made significant improvement, which "seem[ed] to be occurring <u>because</u> he [wa]s in a more productive educational setting" that suited him: Fusion. *Id.* at 8; Ex. D.

In June 2021, the CSE convened to develop J.Z.'s IEP for the 2021-2022 school year. In the IEP, the District recommended J.Z. attend the "Twilight program" (also referred to as the "credit recovery program") for five hours per week, two 30-minute counseling sessions per week and one 60-minute session per month of parent counseling and training services. *Id.* The Twilight program is located within the Hewlett High School. In addition, the CSE recommended "the following as supplementary aids and services, program modifications, and accommodations: clearly provided direction and expectations; step-by-step outlines; check points for long term assignments . . .; hands on activities" and other minor interventions. *See id.* at 9. The district also summarized these services in a prior written notice ("PWN") dated June 17, 2021. *See id.*

In response, B.Z. "requested information to be provided on the Twilight program and out of district programs." *Id.* The District emailed B.Z. on June 22, 2021, identifying "[a]s per our discussion" several out of district programs "the CSE would explore for [J.Z.] to attend beginning in Fall 2021[.]" *Id.* The District issued another PWN that day requesting to send J.Z.'s applications to out of district therapeutic day school programs "for immediate consideration." *Id.* at 10. The PWN stated these were considered because J.Z. "currently demonstrate[d] the need for a more supportive educational environment that c[ould] better meet his academic, social and emotional needs[.]" *Id.*

On June 23, 2021, B.Z. notified the District that he intended to unilaterally place J.Z. at Fusion for the 2021-22 school year, including summer 2021, and to seek reimbursement. *Id.* In his letter, B.Z. stated that the District "refused to consider continuing [J.Z.'s] placement at Fusion[.]" *Id.* B.Z. claimed that, to date, he was not clear on the recommended programs under consideration, what size class J.Z. would be placed in, and stated that he had not yet received J.Z.'s IEP or a Non-Public School ("NPS") recommendation. *Id.*

On July 22, 2021, B.Z. requested an impartial hearing asserting procedural and substantive challenges to the District's recommendations for J.Z. B.Z. was then notified on July 29, 2021 that J.Z. was accepted to one out of district program proposed by the District. *Id.* B.Z. thereafter executed enrollment at Fusion on September 26, 2021. *Id.* at 12.

The CSE held another review on October 14, 2021. *Id.* At that hearing, the CSE rejected the out of district program that J.Z. was admitted into because it could not meet the student's requirements. *Id.* at 12-13. The IEP again recommended the Twilight program, but noted J.Z.'s therapist's input that a "new school placement w[ould] be detrimental to [the student's] current social/emotional position[.]" *Id.* at 13.

B.Z. then filed an amended Due Process Complaint on November 10, 2021.

### C.  Procedural History

Numerous impartial hearings were held in the spring and summer of 2022 before IHO Barbara J. Ebenstein ("the IHO").  *See* AR at T1-T749.  The IHO issued a decision on August 24, 2022, finding that the District had failed to offer J.Z. a FAPE for the 2021-2022 school year, that Fusion was an appropriate placement, and granted B.Z.'s request for tuition reimbursement.  IHO Decision; *see* SRO Decision at 16.

The IHO determined that although procedural irregularities existed, the irregularities did not amount to a FAPE denial.  IHO Decision at 22-23.  The IHO determined that the IEP was procedurally deficient in that it failed to indicate that the District was seeking out-of-district therapeutic school placements – saying that this "created inconsistent and confusing paperwork." *Id.*  Further, the IHO found that the PWN was highly unusual, and noted that the CSE failed to "discuss[] a transition plan for [J.Z.] despite his age and need for one." *Id.* (citing T. 171).

The IHO found that the IEP's recommendation of the Twilight program was substantively inappropriate because "the two IEPs were not reasonably calculated to enable [J.Z.] to make educational progress in light of his unique circumstances[,]" including his severe mental illness. *Id.* at 23; *see* SRO Decision at 17.  The substantive shortcoming amounted to a FAPE denial and the IHO awarded tuition and transportation reimbursement to B.Z.  IHO Decision at 28.

The District appealed the IHO Decision to the SRO.  The SRO reversed. In doing so, the SRO found that (1) the IHO applied the incorrect legal standard, (2) the IHO erroneously concluded that J.Z. required 1:1 instruction, and (3) that the District's placement was "reasonable." SRO Decision at 34-39.  The SRO refused to consider several of B.Z.'s arguments on the ground

that B.Z.'s arguments were either not raised in the amended due process complaint or not cross-appealed to the SRO. *Id.* at 22-26.

## LEGAL STANDARD

Summary judgment in an IDEA case "triggers more than an inquiry into possible disputed issues of fact." *M.H.*, 685 F.3d at 225 (2d Cir. 2012) (citation omitted). A motion for summary judgement in this context is a mechanism "for reviewing a state's compliance with the procedures set forth in the IDEA in developing the specific IEP at issue and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *M.H.*, 685 F.3d at 225-26 (citation omitted). Essentially, it is an appeal from an administrative determination. *Id.*

Under the statute, a district court must "review the records of the administrative proceedings[,]" "hear additional evidence if so requested by either of the parties[,]" and "bas[e] its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *accord M.H.*, 685 F.3d at 226. At the same time, a reviewing court "must give 'due weight'" to the administrative proceedings "mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Gargliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206, 208 (1982).

## DISCUSSION

Claims for tuition reimbursement under the IDEA are assessed under the *Burlington/Carter* test. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). The test asks "(1) whether the school district's proposed [IEP] will provide the child with a free appropriate public education; (2)

whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). The school district "bears the initial burden of establishing the validity of its plan" and, if successful, the burden then shifts to the parents to show the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184-85.

## A.  Retrospective Testimony and "Bait & Switch"

Before reaching the substance of J.Z.'s IEP, the Court first addresses B.Z.'s argument that the SRO relied upon impermissible retrospective testimony that resulted in a "bait and switch." *See* Pl's Mem. at 10-11. B.Z. argues that the District initially failed to locate a specific school in its June 2021 IEP, and thereafter "attempted to modify its recommendation partway through the school year[,]" leading the SRO to rely upon evidence extrinsic to the District's initial recommendation in its June 2021 IEP. *Id.* at 10. B.Z. argues that the District's IEP was "unclear and not definite" and lacked specific information, including class size. *Id.* at 11. Further, B.Z. argues that the District's recommendation of the Twilight program in its October 2021 IEP was "completely different" from the suggestion in the June 2021 PWN – resulting in an improper "bait and switch." *Id.* The District argues in response that because the testimony considered by the SRO "merely elucidated what the IEP already offered," rather than modified or materially altered the services listed in the IEP, this does not constitute retrospective testimony. Def's Mem. at 21.

"Prior to making a placement decision, a parent must have sufficient information about the proposed placement school's ability to implement the IEP to make an informed decision as to the school's adequacy." *D.C. ex rel. E.B. v. New York City Dep't of Educ.,* 950 F. Supp. 2d 494, 510 (S.D.N.Y. 2013). Parents must decide at this point whether to accept the placement and must rely on the information provided in the IEP to do so, creating a significant reliance interest. *Id.* Therefore, "retrospective testimony," in which a school district attempts to justify an educational

placement *after the fact* based on hypothetical changes that could have been made to implement the IEP, is impermissible and results in a "bait and switch" of the parent. *Id.*; *see R.E.*, 694 F.3d at 185 (prohibiting "retrospective testimony" "that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement").

Here, although the District indicated the possibility of a different recommendation in its June 2021 PWN, it specifically recommended the Twilight program in both the June 2021 and October 2021 IEP. *See* Ex. 3 (June 2021 PWN); Ex. 1 (June 2021 IEP); Ex. 2 (October 2021 IEP). In testimony before the IHO, District witnesses provided more specific information about how the Twilight program operates, but "testimony regarding state-offered services may only explain or justify what is listed in the written IEP." *R.E.*, 694 F.3d at 185; *accord E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 462 (2d Cir. 2014). Nonetheless, B.Z. has not pointed to any specific testimony showing "materially different" services upon which the SRO relied.[3]

B.Z.'s claim that the District failed to find a NPS school for J.Z., and that therefore its recommendation was deficient, is without merit. In any event, the District need only provide the "general type" of education services in which the student is placed, not a specific location. *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009). Having specifically recommended the Twilight program for J.Z. in the June 2021 – *i.e.*, both the location and type of program J.Z. would be assigned – the IEP was not procedurally deficient for this reason. *See* Ex. 1 at DE11-13

---

[3] Plaintiff only cites to testimony about Twilight which he claims is "confusing and conflicting." Pl's Mem. at 11 (citing T. 185, 264, 275, 279). These pages include introductory testimony of witnesses and, *inter alia*, explain that the class size in the Twilight program varies, and that classes are "three-hour blocks." Nothing in these citations are particularly confusing or contradictory, and include nothing that would constitute retrospective testimony.

Having found that the District did not provide impermissible retrospective testimony, no "bait and switch" has resulted.  B.Z. therefore had sufficient information to make an informed decision as to the Twilight program's adequacy.  *D.C.,* 950 F. Supp. 2d at 510.

## B.  Scope of the Issues for Judicial Review

On appeal, the SRO excluded several of B.Z.'s arguments, finding that the issues were not properly preserved for review.  SRO Decision at 22-26.  B.Z. now argues that the SRO erred, and these issues are properly before this Court.  Pl's Mem. at 11-13.  The District disagrees, arguing B.Z.'s claims have been abandoned.  Def's Mem. at 24.

### 1.  Extracurricular Activities

B.Z. argues that "the SRO improperly held that the District's lack of extracurricular programming was outside the scope of the hearing even though the District opened the door to this issue" by asserting that the IEP placement in the Twilight program was a better placement in part because of its extracurricular offerings.  Pl's Mem. at 13.

The parties do not dispute that B.Z. did not raise the issue of extracurricular activities in the due process complaint.  *See id.*; Def's Mem. at 16.  The IHO did not consider the question in her opinion, but testimony presented by both parties touched on whether Twilight and Fusion had art and music offerings for J.Z.  T. 70-72; 334, 341, 711, 733-34.  In his answer to the District's SRO appeal, B.Z. argued in part that the Twilight program was not an appropriate placement because it did not offer these classes which "are the 'lynchpin' of J.Z.'s success[.]"  AR at P67.  The SRO refused to consider that argument on appeal because it was not raised in the due process complaint.  SRO Decision at 23-24.

The IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the

other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). "District courts in this circuit have held that issues not raised in due process complaints are foreclosed from review in federal court, absent agreement from the opposing party." *C.F.*, 746 F.3d at 78. However, this standard is inapplicable to the issue here because the District, not B.Z., raised the issue of extracurricular activities. *See M.H.*, 685 F.3d at 250. When the District "argue[s] issues outside the scope of the due process complaint" the parents are not barred from responding to those arguments or "contesting the appropriateness of the methodologies offered in the IEP's recommended program." *Id.* at 250-51.

The first mention of extracurricular activities at the J.Z.'s impartial hearing came from the District's first witness, Dr. Lynne Einberg ("Dr. Einberg"), when she testified why she believed the Twilight program was appropriate for J.Z. T. 70-71 ("And lastly . . . he could also engage in some other, you know safe extracurricular activities . . . I know he appreciates music and art. We have clubs here. It would give him potential access to that[.]"); T. 72 (stating that Twilight offered "tremendous access" to extracurriculars). Further, the District did not object when extracurriculars and art and music programming were discussed by Plaintiff's witnesses. *See* T. 334, 341, 711, 733-34; *see M.H. v. New York City Dep't of Educ. ("M.H. I")*, 712 F. Supp 2d 125, 151 (S.D.N.Y. 2010), *aff'd*, *M.H. II*, 685 F.3d 217. As such, this discussion did not come as a surprise to the District. Here, like *M.H. II*, B.Z. challenged the substantive sufficiency of the IEP and the District chose to respond by arguing that its placement was appropriate in part because of certain offerings. *See M.H. II,* 685 F.3d at 250-51.

"In these circumstances, the [IDEA] does not bar the parents from contesting the appropriateness of the [offerings] in the IEP's recommended program." *Id.* Accordingly, the SRO erred in refusing to consider B.Z.'s argument regarding extracurricular offerings. However, B.Z.

does not argue before this Court that the IEP was insufficient because of the lack of extracurricular programming.  *See generally*, Pl's Mem.  The Court need not consider the issue further.

### 2.  Parent Participation & Predetermination

B.Z. asserts that the District violated proper procedure by denying him meaningful participation in the IEP process.  Pl's Mem. at 20.  B.Z. points out that the SRO incorrectly concluded that the IHO ruled on this issue, when the IHO had not and therefore, the IHO's failure to reach the issue did not require that he cross-appeal to the SRO.  *Id.*  The District disagrees, arguing B.Z. failed to preserve this issue for review because he did not file a cross-appeal.  Def's Mem. at 18.

Here, the IHO's opinion did not address whether B.Z. was given a meaningful opportunity to participate in the IEP such that the District's placement was predetermined.  *See generally* IHO Decision.  The SRO found that the IHO did make this determination, and therefore that J.Z.'s parents failed to cross appeal the issue.  SRO Decision at 24-25.  The SRO further found that the record did not support a finding of predetermination.  *Id.*  However, the SRO's conclusion regarding the IHO's analysis of predetermination was in error.  *See id.*; *see generally* IHO Decision.

The District and the SRO are correct that IDEA regulations provide "A respondent who wishes to seek review of an impartial hearing officer's decision may cross-appeal from all or a portion of the decision by setting forth the cross-appeal in an answer" and must "clearly specify the reasons for challenging the impartial hearing officer's decision, identify the findings, conclusions, and orders to which exceptions are taken, or the failure or refusal to make a finding, and . . . indicate the relief sought by the respondent."  8 N.Y.C.R.R. § 279.4(f).  However, the overwhelming authority in this Circuit has found that when an issue is *unaddressed* by the IHO

and the party is not aggrieved by the IHO's findings overall, failure to cross-appeal does not constitute a waiver. *G.S. v. Pleasantville Union Free Sch. Dist.*, 19-CV-6508 (CS), 2020 WL 4586895, at \*15-16 (S.D.N.Y. Aug. 10, 2020) (collecting cases); *see id.* (citing *NB & CB v. N.Y.C. Dep't of Educ.*, 15-CV-4948 (AT), 2016 WL 5816925, at \*4 (S.D.N.Y. Sept. 29, 2016) ("The DOE is correct that because the IHO did not address the allergy claims, the DOE was not required to cross-appeal on those claims to the SRO."), *aff'd sub nom. N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29 (2d Cir. 2017)); *accord T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 337-38 (S.D.N.Y. 2013) ("Most judges in this district have concluded that when an IHO rules in favor of a parent on some grounds, but fails to reach other grounds alleged in the parent's due process complaint, the parent's failure to cross-appeal those issues to the SRO does not result in their waiver."). Therefore, because the IHO did not reach the issue of predetermination, B.Z. was not obligated to cross-appeal.

### 3. Remaining Issues

The parties also dispute whether the SRO properly found the following arguments were waived by B.Z.'s failure to cross appeal the IHO decision: the District's failure to (1) conduct a Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP"), Pl's Mem. at 11-12, Def's Mem. at 18, (2) provide an adequate post-secondary transition plan, Pl's Mem. at 22, and (3) provide Extended School Year ("ESY") services, *id.* at 20; Def's Mem. at 18. B.Z. argues that he was not required to cross-appeal because "B.Z. fully prevailed at the impartial hearing [and, therefore] he was not an aggrieved party[.]" Pl's Mem. at 12.

The IHO addressed each of these issues in the findings of law. With respect to the FBA and BIP, the IHO found that J.Z.'s psychological evaluation never suggested that he required them and, therefore, "[J.Z.] was not in need of an FBA nor a BIP." IHO Decision at 22. The IHO

finding states that "neither CSE meeting for the 2021-2022 school year discussed a transition plan for [J.Z.] despite his age and need for one." *Id.* at 23. Lastly, B.Z. incorrectly argues that the IHO did not address the District's failure to recommend ESY services. Pl's Mem. at 20. In fact, the IHO clearly stated "I find that [J.Z.] did not qualify for ESY." IHO Decision at 22.

The applicable regulations clearly provide that a "respondent," i.e. the ultimately prevailing party, "may cross-appeal from all *or a portion* of the decision by setting forth the cross-appeal in an answer" and "shall clearly specify the reasons for *challenging the impartial hearing officer's decision*[.]" 8 N.Y.C.R.R. § 279.4(f) (emphases added). The IHO's findings on these issues were adverse to the B.Z. in that they rejected his arguments raised in the due process complaint. B.Z.'s reliance on *G.S.*, 2020 WL 4586895, at *16, and related cases is inapposite. *See* Pl's Mem. at 12 (citing *M.C. on behalf of J.C. v. Mamaroneck Union Free Sch. Dist.*, 17-CV-1554 (CM), 2018 WL 4997516 (S.D.N.Y. Sept. 28, 2018); and *D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 588 (S.D.N.Y. 2012)). Those cases clearly state that a cross-appeal is not necessary when an issue was *not addressed*. *See, e.g.*, *G.S.*, 2020 WL 4586895. Although B.Z. did argue these issues in his answer before the SRO, he has conceded this was not an attempt to cross appeal. *See* Pl's Mem. at 12 ("[B.Z.] did not cross appeal"). Moreover, no part of his answer to the SRO appeal clearly specifies that it is challenging the IHO's findings at all. *See* AR at P64-75; *see also* 8 N.Y.C.R.R. § 279.4(f). Accordingly, the SRO properly held that B.Z. failed to preserve his right to seek review on these issues.

## C. Adequacy of the IEP

### 1. Procedural Compliance

B.Z. has failed to preserve many of his challenges to the District's procedural compliance. Therefore, the only remaining issue before this Court is whether J.Z. was denied a FAPE because

the IEP placement was "predetermined."  Pl's Mem. at 19-20.  B.Z. argues that the District refused to consider B.Z.'s request for an alternative 1:1 program and instead suggested two "incompatible and inconsistent programs."  *Id.* at 20.  The District asserts the SRO correctly found that the record establishes that it had an "open mind" and that B.Z. had a full opportunity to participate.  Def's Mem. at 15-16.

The IDEA envisions a collaborative process in which parents can participate in developing a suitable educational placement for their child.  *See* 20 U.S.C. § 1415(b)(1); *see also* 34 C.F.R. § 300.322; 8 N.Y.C.R.R. 200.5(d).  A CSE's failure to meaningfully consider a parent's input or views on a child's educational placement is known as "predetermination."  *See E.H. v. New York City Dep't of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016).  Predetermination is inconsistent with the goals of the IDEA and "amounts to a procedural violation of Section 1415, and 'can rise to the level of a substantive harm, and therefore deprive a child of a [FAPE], where the child's parents are effectively deprived of meaningful participation in the IEP process.'"  *Id.* (alteration in original) (quoting *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sen. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y.2011)).

The facts presented here do not support B.Z.'s argument that the District has "blatantly failed to consider B.Z.'s request for a 1:1 program."  *See* Pl's Mem. at 20.  The District responded to B.Z.'s requests to find J.Z. an alternative placement and attempted, albeit unsuccessfully, to place J.Z. at a therapeutic day school.  *See* Ex. 3 at DE32 (indicating the District was "exploring . . . out of district therapeutic day programs" and that the parent "requested information to be provided on . . . out of district programs.").

The SRO found that the hearing record "amply supports that the [D]istrict had an open mind with respect to the programming recommendations and considered the recommended

consultant teacher services at Twilight, as well as a therapeutic day program, and home instruction, and that the parent, along with private evaluators and staff from Fusion had a meaningful opportunity to participate in the development of the IEPs."  SRO Decision at 25 (citing *B.K. v. New York City Dep't of Educ.*, 12 F. Supp.3d 343, 358-59 (E.D.N.Y. 2014) (holding that "active and meaningful" parent participation undermines a claim of predetermination).  This Court agrees.  Accordingly, J.Z. was not denied a FAPE based on any procedural violation considered here.

### 2. Substantive Adequacy

A substantively inadequate IEP "automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190.  An IEP is substantively adequate if it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).  While the IEP need not "maximize the potential of each handicapped child," *Rowley*, 458 U.S. at 200, it "must aim to enable the child to make progress." *Endrew F.*, 580 U.S. at 399, 403 (noting the "ambitious" purpose of the IDEA in response to a perception "that a majority of handicapped children . . . [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'").  Therefore, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *A.M. v. New York City Dep't of Educ.*, 845 F.3d 523, 541 (2d Cir. 2017) (citations omitted).

B.Z. argues that the District's recommendation of the Twilight program in J.Z.'s June 2021 IEP was not reasonably calculated to provide educational benefit to J.Z. given his circumstances.  Pl's Mem. at 13-14.  B.Z.'s primary challenge to the appropriateness of the IEP is grounded in his assertion that the proposed placement failed to provide J.Z. the individualized attention he needed.  Pl's Mem. at 13-19.  B.Z. argues that the IHO and experts familiar with J.Z. agreed that "J.Z. could

receive educational benefit only from a 1:1 program" and also that the District's recommendation consequently denied J.Z. a FAPE. *Id.* at 16. B.Z. argues the Twilight program was inappropriate because it was not intended to provide "a special education student's entire academic program," did not provide J.Z. with the flexible schedule he needed and could not keep him on pace to graduate. *Id.* at 17-18. Moreover, B.Z. points to J.Z.'s recorded history of refusing to enter the school building where Twilight was located, which the District offered no plan to address. *Id.* at 18. In its cross-motion, the District urges the Court to defer to the SRO's findings. Def's Mem. at 20-21. Having reviewed the parties' arguments and the administrative record as a whole, the Court agrees with B.Z. that the District failed to show that the Twilight program was reasonably calculated to enable J.Z. to make educational progress, and therefore J.Z. was denied a FAPE for the 2021-2022 school year.

The IHO heard a myriad of testimony and received evidence regarding the appropriate educational setting for J.Z., including testimony from witnesses involved in J.Z.'s CSE meetings, psychological evaluations, and education. The witnesses included Hewlett High School psychologists and officials tasked with special education services; Dr. Marks, a private neuropsychologist who evaluated J.Z.; Plaintiff B.Z.; Fusion faculty who instructed and observed J.Z.; and Dr. Perret, J.Z.'s psychiatrist. *See generally* T., ECF 13-3. The testimonial and documentary evidence presented to the IHO uniformly support B.Z.'s position that the Twilight program would not provide J.Z. with the educational environment he required to make progress.

The administrative record as a whole demonstrates that J.Z. did not earn any high school credits before he was placed at Fusion in January 2021, but that after his placement at Fusion, J.Z. showed tremendous progress both academically and emotionally. Ex. 8 at DE44.[4] The District

---

[4] *See* Dr. Marks' Testimony T. 328-29 ("[D]espite the menagerie of interventions, pharmacologically and therapeutically that have been brought to bear in his situation, none of which necessarily really kind of prove like a

relied upon the report of Dr. Marks, which described J.Z.'s past educational placements as "ineffective if not deleterious. Ex. D at PE39. But, Dr. Marks opined that J.Z.'s placement at Fusion "strikes the correct balance" in part because of "its individualized nature" and that "a transition to a conventional, more densely populated setting will constrain his educational development and elicit possible regression." *Id.* At the IHO hearings, Dr. Marks echoed these statements saying that a shift to a non-1:1 classroom setting "would really set [J.Z.] back in a meaningful way," T. 330, and that his current setting "is indispensable." T. 346; *see also* T. 327, 329, 335, 346, 370-71. Dr. Perret, however, testified that the only setting in which he believed J.Z. could make academic progress was 1:1 instruction.[5] Dr. Perret described J.Z.'s disability as being so severe that J.Z. was at times "ineducable" "to the extent that his functioning did not include the ability to be in a classroom." T. 621-2.

In its cross-motion, the District suggests that no part of the recommendations incorporated into J.Z.'s IEP *required* that he be placed in a 1:1 educational setting *per se*. Def's Mem. at 17. But the District's conclusion belies the wealth of testimony that clearly states J.Z. would likely regress in a setting that was more densely populated – effectively anything but a 1:1 program. The Twilight program could not guarantee J.Z. would be in a 1:1 setting because Twilight's class size varied considerably between one student up to nine. T. 264-65, 278-79; *see also* T. 74. Furthermore, the District's claim that the Twilight program "offered a 'lot of flexibility' in terms

---

silver bullet with respect to fostering educational engagement, it seemed not only a viable but a very meaningful formula for him at the time. Again, he was, at that point or prior to that point, I should say, he really hadn't earned any high school credits, and he was engaged, and it was not only bringing him educationally in ways that were making progress, it was really yielding dividends with respect to his broader lifestyle.")

[5] T. 709-10 ("[J.Z.] is in a one-to-one instruction . . . and I think that's very important because I think the only way to get [J.Z.] to build up enough confidence to be able to overcome that social anxiety is to have a lot of positive reinforcement in the form of academic achievement and the one-to-one instruction where he doesn't feel like he is being judged. . . . So my concern about a program . . . like this Twilight program . . . I can't imagine he would attend. And even if he did attend, I don't know how he would be able to perform in a small class like that."); *see also* T. 727-28; T. 742.

of how small classes could be, and that while the student-teacher ratio varied, it could be as small as 'three-to-one' or 'five-to-one[,]'" Def's Reply at 2-3 (citing T. 122, 161), is misleading. The testimony is clear that the class size was simply dependent on how many students were participating at a particular time—not that it was flexible to suit J.Z.'s particular needs. T. 122 (stating that class ratio "var[ies]. They can be three-to-one, five-to-one. It depends."); T. 73-74 (stating "I don't know the exact number [of students in the Twilight program]. It can vary."); T. 75 (teacher ratio "varies, depending on the number of students in Twilight.").

The District seems to claim that the Twilight program did offer "1:1 instruction provided by a consultant teacher." Def's Mem. at 5. J.Z.'s IEP recommended he receive 10 hours per week of "Consultant Teacher Services" to be provided to J.Z. at the Twilight program. Ex. 1 at DE17. But this does not constitute individualized instruction as the District suggests. Rather, the IEP provided J.Z. would assigned a consultant teacher who would attend his classes with him, not provide separate instruction. T. 708-09; *see* T. 295-96. The consultant teacher "would be responsible for adapting . . . the content, methodology or delivery of instruction . . . *during instruction*." SRO Decision at 36 (emphasis added). Moreover, those familiar with J.Z.'s psychological issues testified that such an assignment would do more harm than good. For example, Dr. Perret stated that "because [J.Z.] has [social anxiety], [he] would find an attendance teacher like that very embarrassing" and "likely lead to school refusal." T. 708-09. Dr. Marks similarly testified that "an individualized support presence . . . would feel stigmatizing [to J.Z.]." T. 341.

Further concerning is the consensus among witnesses that J.Z. consistently refused to enter the premises of Hewlett High School where the Twilight program was held. *See* SRO Decision at 37. Despite the SRO's finding that J.Z. had entered the school building to meet with individuals

for appointments, SRO at 37 (citing T. 423, 438), J.Z. would not enter to attend classes.[6]  The hearing testimony bears out a real concern that, if assigned to Twilight, J.Z. simply would not attend.[7]  How a student can be expected to make educational progress when, by all accounts, he will not enter the building to attend his classes – without any concrete plan to remedy the situation – is beyond this Court's comprehension.

Although this Court is "mindful that the question of how best to educate [a disabled] child is a difficult question of educational policy that requires deference to the decisions of administrative experts, where, as here, it appears plain that contrary to the findings of the SRO, the placement was not adequately designed to address and improve the child's educational needs, the administrative officer's analysis is deserving of no deference[.]"  *A.M.*, 845 F.3d at 543 (citations omitted); *accord  R.E.*, 694 F.3d at 189 (holding that deference to SRO may not be warranted where "SRO's determinations are insufficiently reasoned to merit that deference").

In finding that J.Z.'s placement in the Twilight program was appropriate, the SRO noted that Dr. Marks "did not indicate that the student required 1:1 instruction per se[,]" and that Twilight program was "not conventional or densely populated."  SRO Decision at 35. The SRO concluded that because J.Z. was improving at the time of the CSE, "it was reasonable for the [D]istrict to recommend a program with more access to nondisabled peers to move towards a less restrictive instructional format."  *Id.* at 37. But this conclusion ignores the corroborated testimony that J.Z.

---

[6] *See* T. 73 (Questioning of Dr. Einberg: "Q. But [J.Z.] will not enter the high school for educational purposes isn't that correct?  A. At this point, yes."); T97:4-9 (Questioning of Dr. Einberg "Q. And isn't it true that [J.Z.] wouldn't even enter Hewlett High School to go to clubs, never mind academics? A. At that time in June [2021], yes.").

[7] When asked whether J.Z. would have shown up for the Twilight program, Dr. Marks answered "I don't anticipate he would have been receptive to it. I don't think he would have gotten there."  T. 380:18-20.  Dr. Perret testified that "I can't imagine [J.Z.] would attend" and that he believed J.Z. would find the assigned program with "an attendance teacher like that . . very embarrassing.  I imagine that that would very quickly lead to school refusal."  T. 708-09. Similarly, Dr. Marks stated that he was concerned the assigned program would result in "recapitulate[ing] what [J.Z.'s] prior experiences had been, mainly that he just wouldn't show up."  T. 341; *see* T. 740. B.Z. testified that when the District recommended the Twilight program "I reminded [the District representatives] that . . . [J.Z.] can't attend this building and they were, like, oh, that's right."  T. 470*; see also* T. 464-5, 417- 18.

was improving precisely because of the individualized, 1:1 education he was receiving and that he had not experienced progress in any other setting. *See* Ex. D at PE39; T. 330, 346, 327-29, 335; *see also R.E.*, 694 F.3d at 194 ("The fact that some reports did not mention a specific teaching methodology does not negate the clear consensus that [the student] required [particular] support."); *A.M.*, 845 F.3d at 543-44 (holding IEP was substantively inadequate where reports "specifically recommended the continued need for ABA therapy and 1:1 support in order for [the student] to progress" and no evidence was presented to suggest otherwise); *C.F.,* 746 F.3d at 81 (same). Moreover, the SRO's analysis only addresses whether the District's recommendation was "reasonable." *See* SRO Decision at 37-39 (quoting *Endrew F.*, 580 U.S. at 400, for the proposition that "the issue is 'whether the IEP is reasonable'").  But the correct legal standard is whether J.Z. could be expected to make educational progress, *see Rowley*, 458 U.S. at 203-204, a benchmark the SRO never addressed.

Additionally, when presented with concerns that J.Z. would refuse to enter the school building, the SRO concluded, without support, it was "reasonable for the CSE to believe that the student could generalize his progress" because he was attending a school building at Fusion.  SRO Decision at 37.  The remainder of the SRO's analysis with respect to the program's flexibility and the need to "pause" instruction, *id* at 38, is insufficient to overcome its other errors.

For the above reasons, the SRO's decision was not "well-reasoned" or "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," and therefore merits no deference.  *M.H.*, 685 F.3d at 244.  The Court therefore turns to the IHO's decision to determine the substantive adequacy of J.Z.'s IEP.  *See R.E.*, 694 F.3d at 189 (citing *M.H.*, 685 F.3d at 244).

The IHO's decision correctly focuses on the likelihood of J.Z.'s educational progress given his "unique circumstances" in the District's recommended program.  IHO Decision at 21-23.  The District argues, as the SRO found, that the IHO applied the incorrect legal standard by impermissibly comparing the Twilight program and Fusion.  Def's Mem. at 10; *see* IHO Decision at 22-23.  However, in reaching its conclusion the IHO, unlike the SRO, cited and applied the proper legal standard: whether "the two IEPs were [] reasonably calculated to enable [J.Z.] to make educational progress in light of his unique circumstances."  IHO Decision at 23 (citing *Endrew F.*, 580 U.S. at 403-404).  In comparing the Twilight program to Fusion, the IHO did not ignore this standard.  Rather, the Court views the IHO's comparison of the two programs as an analytical tool to assess the likelihood that Fusion might allow J.Z. to make educational progress, given that this was the only program in which J.Z. had earned high school credits.  Further, the District's own witnesses testified before the IHO that the District selected the Twilight program as an attempt to "replicate" Fusion – thus inviting the comparison by the IHO to assess J.Z.'s potential educational progress in the Twilight program.  *See* T. 212-13.

Based on its own interpretation of the administrative record, as discussed above, the Court agrees with the IHO that the Twilight program was not reasonably calculated to meet J.Z.'s educational needs. The District has failed to demonstrate that J.Z.'s IEP will provide him with a free appropriate public education and therefore B.Z. has met the first prong of the *Burlington/Carter* test.

The Court therefore need not address the remainder of the parties' arguments.

## D.  Appropriateness of J.Z.'s Placement at Fusion and Balance of Equities

B.Z. must demonstrate that the private placement at Fusion is appropriate and that the equities lie in his favor to receive reimbursement—the remaining two prongs of the *Burlington/Carter* test.  *See C.f.*, 746 F.3d at 73.

As an initial matter, the District urges the Court to remand the remaining determinations to the SRO. Def's Mem at 24-25. The District cites *INS v. Ventura* for the proposition that only in "rare circumstances" should a court of appeals decide an issue usually placed in the hands of an agency. Def's Mem. at 24, citing *Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."). But that case is easily distinguishable as an immigration case in which the circuit court made a factual determination on which the agency had not yet had a chance to consider. *See Ventura*, 547 U.S. at 16-17. Rather, in the IDEA context, remand is appropriate "where the district court has received insufficient guidance from state administrative agencies as to the merits of a case." *New York City Dep't of Educ. v. V.S.*, 10-CV-510 (JG) (JO), 2011 WL 3273922, at *11, *10 (E.D.N.Y. July 29, 2011) (declining to remand case to SRO where SRO declared the case moot where "the drawbacks of remanding the case to the SRO outweigh the benefits, particularly where one state administrator has already provided a thoughtful opinion on the merits of the case" and finding that "[o]ther courts have reached the merits of [IDEA] cases in the absence of SRO decisions"). Here, the IHO already made a reasoned and thorough opinion on these issues, thus there is sufficient information for this Court to issue a ruling here.

Parents seeking reimbursement need only demonstrate that the placement is "reasonably calculated to enable the child to receive education benefits." *Rowley*, 458 U.S. at 297 (the placement must provide "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction."). As discussed above, there is ample evidence that J.Z. made significant educational progress at Fusion prior to his June 2021 IEP, and that he would continue to do so. The IHO correctly found that the program provided J.Z. with the support he required: individual and

23

adaptive instruction outside the home, opportunities to socialize, a flexible schedule, and "intensive" instruction allowing J.Z. to earn high school credits.  IHO Decision at 23-26. Therefore, Fusion was an appropriate placement for J.Z.[8]

Further, in formulating the 2021 IEP, the District specifically used Fusion as a model for selecting the appropriate program for J.Z.  Based on this fact, it seems clear both B.Z. and the CSE found Fusion to be an appropriate choice to meet J.Z.'s needs and allow him to advance both academically and mentally.  Likewise, the District's argument that the program "lacked academic rigor" rings hollow in light of testimony that the Twilight program would only provide J.Z. with instruction five hours per week.

In determining whether equitable considerations support reimbursement, "the district court may consider many factors, including, *inter alia,* whether plaintiff's unilateral withdrawal of [his] child from the public school was justified, whether plaintiff provided the Department with adequate notice of the withdrawal, whether the amount of private-school tuition was reasonable, whether plaintiff should have availed [himself] of need-based scholarships or other financial aid from the private school, and whether there was any fraud or collusion in generating (or inflating) the tuition to be charged to the Department, or whether the arrangement with the school was fraudulent or collusive in any other respect." *E.M.*, 758 F.3d at 461.  "Courts have uniformly held that reimbursement cannot be granted where a parent unilaterally places the student without ever notifying the school board of their dissatisfaction with the IEP." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 376 (2d Cir. 2006) (citations omitted).

---

[8] The District's assertion to the contrary, Def's Mem. at 24, is disingenuous at best.  In recommending the Twilight program and formulating J.Z.'s June 2021 IEP, the District repeatedly asserted that it attempted to replicate the experience and services J.Z. was receiving at Fusion because of his successes there.  T. 212-13; SRO Decision at 35.

The SRO did not reach a determination of the equities and the Court therefore gives deference to the IHO's reasoning. *See, e.g.*, *P.L. v. New York Dep't. of Educ.*, 56 F. Supp. 3d 147, 168 (E.D.N.Y. 2014). Here, the IHO found in favor of B.Z. because (1) B.Z. provided the District with timely notices of his dissatisfaction with the proposed program after each of the CSE meetings; (2) there is nothing to show that B.Z. delayed or obstructed the District's efforts to comply with the IDEA; and (3) B.Z. actively participated in and cooperated the District's placement process. IHO Decision at 26-28; *see M.H.*, 685 F.3d at 254 (finding equitable considerations favored the parents where they "cooperated with the CSE[,] . . . provided private evaluations, participated in the IEP meeting, visited the proposed placement and provided timely notice of their intent to place the student in a private school."). This Court agrees.

Because B.Z. is entitled to reimbursement of tuition costs for the 2021-2022 school year, B.Z. is also entitled to reimbursement for reasonable transportation expenses. The IDEA provides for reimbursement of tuition and "related services," which include "transportation." 20 U.S.C. § 1401(26)(A); 34 CFR § 300.34(a), (c)(16). New York State law also requires school districts to provide students with disabilities with "suitable transportation to and from special classes or programs." N.Y. Educ. Law §§ 4401(1), 4402(4)(a).

## CONCLUSION

For the foregoing reasons, B.Z.'s motion for summary judgment is GRANTED, and the District's cross-motion for summary judgment is DENIED. B.Z. is entitled to tuition expenses for J.Z.'s 2021-2022 school year. Additionally, B.Z. is entitled to reimbursement of reasonable transportation expenses and, pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), reasonable attorneys' fees and costs. B.Z. is hereby directed to file with the Court, by no later than February 28, 2025, a particularized request for transportation reimbursement and attorneys' fees and costs, together with

supporting documentation. B.Z.'s request for attorneys' fees and costs must be in compliance with 20 U.S.C. § 1415(i)(3)(C). Defendant may file any objections there to by March 14, 2025, after which the Court will render its final judgment.


SO ORDERED.

                                                                       _/s/_____

                                                                       ORELIA E. MERCHANT
                                                                      United States District Judge

January 27, 2025
Brooklyn, New York